## _FILED UNDER SEAL PURSUANT TO 31 U.S. Code § 3730(b)_

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| UNITED STATES OF AMERICA and, THE COMMONWEALTH OF VIRGINIA ex rel. MATTHEW A. BOLINGER, M.D.      ) ) ) ) | |
|      Plaintiffs,     ) ) | |
| v.          ) ) | Civil Action File No. _3:16CV304_ |
| CENTRA HEALTH, INC. and BLUE RIDGE EAR, NOSE, THROAT AND PLASTIC SURGERY, INC.    ) ) ) ) | JURY TRIAL |
|      Defendant.     ) ) | |

FILED MAY 23 2016 CLERK, U.S. DISTRICT COURT RICHMOND, VA

### COMPLAINT

Matthew A. Bolinger, M.D. ("Relator"), on behalf of the United States of America and the Commonwealth of Virginia, and by and through his attorneys, alleges as follows:

### NATURE OF THE CASE

1. Relator brings this _qui tam_ action under the federal False Claims Act, 31 U.S.C. § 3729 _et seq._ and the Virginia Fraud Against Taxpayers Act ("VFATA"), Va. Code Ann. § 8.01-216.1 _et seq._, to recover money damages and civil penalties arising from false statements and false claims knowingly submitted or caused to be submitted to, respectively, the United States and Virginia governments (collectively referred to as the "Government") by Centra Health, Inc. (sometimes hereinafter referred to as "Centra") and Blue Ridge Ear, Nose, Throat and Plastic Surgery, Inc. (sometimes hereinafter referred to as "Blue Ridge ENT") (Centra and Blue Ridge ENT are sometimes collectively referred to herein as "Defendants").

1

2.     From July 1, 2008 to June 30, 2009 Centra paid over $100,000 to Blue Ridge ENT through an improper physician recruitment arrangement in violation of the Physician Self-Referral Law, 42 U.S.C. § 1395nn (the "Stark Law") and the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b (the "AKS").

3.     Referrals to Centra by Blue Ridge ENT physicians violated the Stark Law, therefore, Centra was not eligible for reimbursement from Medicare or Medicaid for Designated Health Services rendered pursuant to such referrals.  Medicare and Medicaid would not have paid Centra had they known about the improper financial relationship between Centra and Blue Ridge ENT.

4.     Centra knowingly submitted false claims for Medicare and Medicaid reimbursement for services provided to patients referred by Blue Ridge ENT physicians.  Any payments received by Centra pursuant to such illegal referrals were overpayments which should have been returned to the Government.

5.     Centra knowingly certified compliance with federal and state healthcare laws in its annual cost reports, claims forms, and enrollment applications, which were filed with DHHS and its agents.  As a result of the illegal financial relationship between Centra and Blue Ridge ENT, Centra's certifications in these documents were false.

6.     Under the False Claims Act and the VFATA, Defendants are liable for treble damages and penalties for each claim submitted to Medicare or Medicaid during the period when the improper financial arrangement was in place.

## PARTIES, JURISDICTION, AND VENUE

7.     Relator is Matthew A. Bolinger, M.D., an otolaryngologist (a physician specializing in the study and treatment of diseases and afflictions of the ear, nose, and throat) who is a

206691.6

United States citizen and resident of Iowa. Relator has developed knowledge of the facts alleged herein and the damages caused by Defendants' actions. He has standing to pursue this case.

8. Plaintiffs are: (1) the United States of America acting on behalf of the United States Department of Health and Human Services (sometimes hereinafter referred to as "HHS" or "DHHS") which, through the Centers for Medicare and Medicaid Services (sometimes hereinafter referred to as "CMS"), administers and funds the Medicare and Medicaid programs; and (2) the Commonwealth of Virginia, which, through the Department of Medical Assistance Services ("DMAS"), administers the Medicaid program in Virginia. The United States and Virginia are the real party plaintiffs.

9. Defendant Centra is a large non-profit healthcare system, qualified as tax-exempt under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended. Centra's principal place of business is 1920 Atherholt Road, Lynchburg, Virginia, and its registered agent can be found at 1901 Tate Springs Road, Lynchburg, Virginia. Defendant Centra Health, Inc. consists of Lynchburg General Hospital, Virginia Baptist Hospital, Southside Community Hospital, Bedford Memorial Hospital, Rivermont School and Centra Specialty Hospital, as well as numerous other owned and joint ventured medical groups and ancillary providers. Centra is the dominant healthcare system in Central Virginia, with the nearest non-Centra hospital located approximately fifty (50) miles away. In 2013, Centra Health reported to the IRS that it received over $300 Million in revenue from Medicare and Medicaid.

10. Defendant Blue Ridge ENT is a for-profit otolaryngology practice that was incorporated on August 19, 1971. Blue Ridge ENT is the largest ENT group in Lynchburg and the

3

surrounding region. Blue Ridge ENT is domiciled in Virginia and its principal place of business is 2321 Atherholt Road, Lynchburg, Virginia 24501, and it can be served at the same address.

11. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this is an action arising under the laws of the United States, specifically, the False Claims Act, 31 U.S.C. § 3730(h). This Court has supplemental jurisdiction over the VFATA claim pursuant to 28 U.S.C. § 1367.

12. Venue in this District is proper pursuant to 28 U.S.C. § 1391 and 31 U.S.C. § 3732 because at least one Defendant may be found and transacts business in this District.

13. This Court has personal jurisdiction over Defendants. The facts and circumstances of Defendants' violations alleged herein have not been publicly disclosed in a criminal, civil, or administrative hearing, nor any Congressional, administrative nor General Accounting Office or Auditor General's report, hearing, audit, or investigation, or in the news media.

14. Relator is the original source of information upon which this Complaint is based and he provided disclosure of the allegations of this Complaint to the United States prior to filing.

15. Relator has served on the Commonwealth a copy of the Complaint and written disclosure of substantially all material evidence and information Relator possesses.

## STATUTORY FRAMEWORK

### A. THE FALSE CLAIMS ACT AND VFATA

16. The False Claims Act and VFATA provide, in pertinent part, that any person who: (A) knowingly presents or causes to be presented a false or fraudulent claim for payment, (B)

4

206691.6

knowingly makes uses or causes to be made or used a false record or statement material to a false or fraudulent claim; or (C) conspires to make a false claim, is liable to the United States for a civil penalty between $5,500 and $11,000 <u>per claim</u>, plus treble damages to the Government caused by the fraud. 31 U.S.C. § 3729; Va. Code Ann. § 8.01-216.3.

17.    A person "knows" a claim, statement or record is false if the person: (1) has actual knowledge of the falsity of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729; Va. Code Ann. § 8.01-216.3.

18.    Falsely certifying compliance with Medicare and Medicaid laws and regulations in a hospital cost report can serve as the basis of a false claim. *See U.S. ex rel. Drakeford v. Toumey Healthcare System, Inc.*, 675 F. 3d 394 (4th Cir. 2012); *U.S. ex rel. DeCesare v. Americare Home Nursing*, 757 F. Supp. 2d 573 (E.D. Va. 2010).

### B.    THE STARK LAW AND AKS

19.    The Physician Self-Referral Law (the "Stark Law") and regulations promulgated thereunder prohibit a physician who has a financial relationship (contract or otherwise) with an entity—such as a hospital—from making a referral to that hospital for the furnishing of certain designated health services ("DHS") for which payment otherwise may be made by the government through the Medicare or Medicaid Programs. 42 U.S.C. § 1395nn(a)(1); 42 C.F.R. § 411.353(a).   Except as otherwise provided in the Stark Law and regulations, a financial relationship is defined broadly as any ownership or direct or indirect compensation arrangement. 42 C.F.R. § 411.351.   Prohibited referrals for DHS include all referrals for inpatient and outpatient hospital services, clinical laboratory

services, physical, occupational and speech therapy services, radiology services, radiation therapy services and supplies, durable medical equipment and supplies, parenteral and enteral nutrients, equipment and supplies, prosthetics and orthotics devices and supplies, home health services, and outpatient prescription drugs. *Id.* The Stark Law was enacted to address overutilization of services by physicians who stood to profit from referring patients to facilities or entities in which they had a financial interest.

20. A hospital may not submit for payment a claim to Medicare or Medicaid for services rendered pursuant to a prohibited referral. 42 U.S.C. § 1395nn(a)(1)(B); 42 C.F.R. § 411.353(b). The United States and its agents may not make payments pursuant to such a claim, and hospitals must reimburse any payments that are mistakenly made by the United States. 42 U.S.C. § 1395nn(g)(1); 42 C.F.R. § 411.353(c), (d).

21. The Stark Law has an exception for certain recruitment agreements; however, the recruitment agreement must meet all of the applicable requirements of 42 C.F.R. § 411.357(e) (the "Recruitment Exception").

22. The Recruitment Exception contains two parts: (1) requirements necessary for all recruitment agreements (e.g., that the agreement is set out in writing and not conditioned on referrals or business generated between the parties); and (2) additional safeguards for hospitals seeking to recruit a physician into an existing practice. 42 C.F.R. § 411.357(e)(4). The additional safeguards are necessary to ensure that any recruitment payment that flows from a hospital through an existing group is payment for the benefit of the recruited physician and <u>does not inure to the benefit of the group</u>. 72 F.R. 51048 (9/5/2007) (emphasis added). Because Centra recruited Relator to an existing practice, Centra was required to meet these additional safeguards.

23.    Centra failed to meet at least three of the additional safeguards required by the Recruitment Exception. These three additional safeguards state:

a.    Except for actual costs incurred by the physician practice in recruiting the new physician, the remuneration is passed directly through to or remains with the recruited physician. 42 C.F.R. § 411.357(e)(4)(ii).

b.    In the case of an income guarantee of any type made by the hospital to a recruited physician who joins a physician practice, the costs allocated by the physician practice to the recruited physician do not exceed the actual additional incremental costs attributable to the recruited physician. 42 C.F.R. § 411.357(e)(4)(iii).

c.    The arrangement does not violate the AKS. 42 C.F.R. § 411.357(e)(4)(iv).

24.    The Recruitment Exception does not permit a hospital to subsidize a practice's costs of recruiting and employing non-physician practitioners (e.g., nurses or physician assistants) and does not permit the shifting of inflated rental payments/overhead costs of the practice to the recruited physician. *See* 72 F.R. 51049, 51053. According to CMS, "[t]hese kinds of subsidy arrangements pose a substantial risk of fraud and abuse." 72 F.R. at 51049.

25.    The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, prohibits the knowing and willful payment or receipt of anything of value, directly or indirectly, in exchange for referrals of federal healthcare program business. 42 U.S.C. § 1320a-7b(b)(1), (2). A claim that includes items or services resulting from a violation of the Anti-Kickback Statute constitutes a false claim under the False Claims Act. 42 U.S.C. § 1320a-7b(g). The AKS is enforced by the Office of Inspector General ("OIG"), an agency of within the DHHS.

26.    Defendants conspired to circumvent the Stark Law and AKS by failing to adhere to the terms of the Recruitment Exception.

## C.    THE MEDICARE PROGRAM

27.   Medicare is a program providing health insurance benefits for people who are 65 or older, younger people with disabilities, and people with end-stage renal disease.  42 U.S.C. § 1395c.   DHHS is responsible for the administration and supervision of the Medicare program.   The Centers for Medicare and Medicaid Services is the agency within DHHS directly responsible for the administration of the Medicare program.  CMS contracts with Medicare Administrative Contractors (sometimes hereinafter referred to as "MACs") to administer and pay Medicare claims.  The MAC for Centra's jurisdiction is Palmetto GBA.

28.   At the end of each fiscal year, hospitals must submit a report to the MAC which reconciles payments received with the costs incurred for eligible Medicare and Medicaid services.   These reports are known as "cost reports."  42 U.S.C. § 1395g; 42 C.F.R. § 413.20(b).  The cost reports are audited by the MAC and payments to the hospital are either recouped or increased based on the final cost report.   The key purpose of the Medicare cost report system is to protect the federal government from loss due to mistake or fraud.

29.   As a Medicare provider, Centra was required to, and did, file cost reports with Palmetto GBA for services rendered in 2008 and 2009 as well as all subsequent years.

30.   Centra falsely certified, through its duly authorized officers, that the services identified in these cost reports were provided in compliance with healthcare laws and regulations.

31.   Centra made the same representations although the relationship with Blue Ridge ENT was tainted *and continues to be tainted* as a result of the improper payments previously made by Centra and retained by Blue Ridge ENT.

8

32.     In 2009 alone, Centra received over $215 million in Medicare revenue. *Centra Health, Inc. Final Cost Report, Worksheet S-10 (2009); IRS Form 990, Schedule H (2009).*

### D.     THE MEDICAID PROGRAM

33.     Medicaid is a joint federal and state program authorized under Title XIX of the Social Security Act that provides health and long-term care coverage for those with low incomes. 42 C.F.R. Parts 430-456.

34.     In Virginia, Medicaid is administered by the Department of Medical Assistance Services ("DMAS") and is jointly funded by Virginia and the United States government. Virginia receives a federal matching rate, known as the Federal Medical Assistance Percentage ("FMAP") which provides approximately $1 of federal matching funds for every $1 Virginia spends on Medicaid. Due to the federal funding of the Medicaid program, federal laws and regulations, including the Stark Law and AKS, apply to the Medicaid program and Medicaid payments.

35.     Medicaid hospitals are required to sign a provider agreement in order to become a Medicaid provider. The form states: "The provider agrees to comply with all applicable state and federal laws, as well as administrative policies and procedures of VMAP as from time to time amended." *Virginia DMAS, Medicaid Enrollment Package for Hospitals, (2015).*

36.     In 2009 alone, Centra received over $94 million in Medicaid revenue. *Centra Health, Inc. Final Cost Report, Worksheet S-10 (2009); IRS Form 990, Schedule H (2009).*

### DEFENDANTS' CONDUCT

### A.     THE RECRUITMENT ARRANGEMENT

#### (i)     Background and the Recruitment Structure

9

37.  In June of 2007, Centra and Blue Ridge ENT jointly recruited Relator out of medical school residency to move to Lynchburg and join Blue Ridge ENT.

38.  Prior to Relator's recruitment, Blue Ridge ENT's founding member retired, leaving Blue Ridge ENT with three owners, Drs. Courville, Hutchison and Mawn.  Relator was recruited to the group to replace the retired Dr. Clark.  Relator provided professional services of the same specialty and from the same facility that had housed all physicians for more than two decades.

39.  In addition to Relator's recruitment arrangement, Centra and Blue Ridge ENT physician owners were financially related through joint ownership in a surgery center known as the Surgery Center of Lynchburg. Each Blue Ridge ENT physician performed hundreds of procedures annually in the surgery center and in Centra's hospitals prior to, during, and after Relator's arrival.

40.  As part of this recruitment arrangement, Defendants and Relator entered into that certain recruitment agreement effective on or about July 1, 2008 in the form attached as Exhibit "A" (sometimes hereinafter referred to as the "Recruitment Agreement").

41.  Centra offered Relator a recruitment package with a guaranteed income of $300,000 ($250,000 for a guaranteed annual salary and $50,000 as a sign-on bonus) for the first year of Relator's practice (July 2008 – June 2009) (the "Income Guarantee" or "Deficit Loan"), a moving expense loan and an educational loan.  The Recruitment Agreement includes the specifics of the Income Guarantee.

42.  The Income Guarantee worked as follows:

   a.  If Relator's Net Cash Receipts for the month were less than his Monthly Guarantee of $20,833.33, then Centra was required to advance funds to Relator in

an amount equal to the difference between his Net Cash Receipts and Monthly Guarantee.

b.  If Relator's Net Cash Receipts for the month were <u>less</u> than his Incremental Expenses ("Deficit Receipts"), Centra's advance to Relator would be the Monthly Guarantee plus the amount of Relator's Deficit Receipts.

c.  Except as provided above, Centra was not, under federal and state law including AKS and the Stark Law and according to the Recruitment Agreement itself, permitted to advance funds to Blue Ridge ENT.  Indeed, if Relator's Net Cash Receipts for the month were <u>greater</u> than the sum of his Incremental Expenses and his Monthly Guarantee, Relator and the Group were required to repay Centra for the amount of the excess.

See <u>Exhibit "A".</u>

43.  The Recruitment Agreement defines Incremental Expenses as:

2.2 Incremental Expenses shall be defined as <u>only those actual and additional costs and expenses attributable solely to [Relator's] employment</u> including but not limited to the insurance, licenses and other costs required hereunder and to benefits to be provided to [Relator] as part of his Employment Agreement with the Group <u>so long as such costs and expenses [sic] attributable solely to [Relator's] employment.   Fixed expenses that pre-exist the commencement of the Practice, such as rent, etc. are not Incremental Expenses.</u>  (emphasis added).

44.  Relator began his employment with Blue Ridge ENT on July 1, 2008.

11

### (ii)    Expenses Improperly Attributed to Relator by Defendants

45.    In its initial offer letter to Relator, Centra states that Centra will provide financial support for… "a portion of office overhead expenses." This offer letter was signed and agreed to by and among Tom Jividen, Senior VP for Centra, and Dr. Courville on behalf of Blue Ridge ENT.

46.    Defendants attributed expenses for the following items to Relator as "incremental expenses:" nursing staff and benefits, rent, telephone/answering service, utilities, maintenance, computer maintenance, medical supplies, office supplies, bank card fees, postage, business M&E, practice promotion, collection fees, professional fees, HCI fees, attorney fees, transcription costs, EBS fees, advertising, equipment depreciation and cleaning services.

47.    Defendants also attributed certain "direct expenses" to Relator, including malpractice costs, dues and education, professional expenses, travel/recruitment, user licenses, and office remodeling.

48.    Several of the expenses attributed to Relator were not actually attributable to him. For example, Defendants attributed salary and benefits for nurse Elsie Peachy even though Nurse Peachy was already an employee of Blue Ridge ENT when Relator was recruited, was not assigned to Relator, did not work with Relator, and was not hired for Relator. Nurse Peachy's salary and benefits represented a fixed overhead cost of the practice which should not have been attributed to Relator.

49.    Defendants also attributed a percentage of the group's rent to Relator, even though Blue Ridge ENT owned the building in which Relator practiced, and any additions or renovations were for the benefit of the group, and not solely for Relator.

206691.6

50.     Prior to Relator's recruitment, Blue Ridge ENT had four physicians operating out of same office, and the addition of Relator did not require additional space or renovation. Indeed, Blue Ridge ENT had operated out of the same space for more than two decades when Relator was added to the practice in order to fill a vacancy resultant from the retirement of Dr. Clark.

51.     Defendants also attributed several items of practice overhead expenses to Relator, which were not solely attributable to him. These costs include, but are not limited to, costs for the practice's phones and answering service (pre-existing costs for the practice); utilities (pre-existing costs for the practice), equipment depreciation (these costs were not attributable to equipment that was added solely for Relator); and a cleaning service (pre-existing cost for the practice).

52.     Relator was unaware that these costs were being attributed to him, and was not involved in the process of determining these expenses.

53.     Relator was a minority owner of Blue Ridge ENT from July 1, 2008 until June 30, 2011, but the other principals and agents of Blue Ridge ENT repeatedly refused to provide Relator with complete financial information about the operations and finances of Blue Ridge ENT.

### (iii)     Mid-Recruitment Year, Defendants Added Costs to Obtain Additional Payments from Centra

54.     Relator's practice became very successful, very quickly. Relator's Net Cash Receipts exceeded the Monthly Guarantee amount ($20,833.33) by the second month of his practice.

55.     By the fourth month of his practice, Relator's Net Cash Receipts were large enough to exceed both the Monthly Guarantee amount and his Incremental Expenses.

206691.6

56.   By his fifth month of practice, it became clear that Blue Ridge ENT was no longer entitled to funds from Centra under the Income Guarantee contained in the Recruitment Agreement, and in fact, would have to repay large amounts back to Centra.

57.   Unbeknownst to Relator, Blue Ridge ENT and Centra agreed to "find more expenses" to attribute to Relator such that Blue Ridge ENT would not have to repay any advances to Centra, and Centra could continue to advance funds to Blue Ridge.  Attached hereto as global Exhibit "B" are communications between Mary Sue Ramey and John Litaker showing the discussion of additional expenses and the need to amend the Recruitment Agreement so that Blue Ridge ENT did not have to repay funds previously advanced. Also attached hereto as global Exhibit "C" is an original financial accounting from the practice showing practice expenses attributed to Relator, and then the revised spreadsheet from January 2009 (the "Revised Spreadsheet").    The Final Financial Spreadsheet showing the final costs and expenses Defendants agreed to attribute to Relator is attached hereto as Exhibit "D".

58.   The newly found "expenses" included:

   a.   Additional "benefits" costs for Nurse Peachy were attributed to Relator, even though Nurse Peachy was an existing employee of the practice and not assigned to Relator. Nurse Peachy also was not offered additional benefits after Relator's recruitment.

   b.   Significantly increased costs for rent, utilities and maintenance were attributed to Relator, even though these costs were pre-existing prior to Relator's joining the practice, and no additional space, utilities or maintenance fees were incurred over the course of the year to justify the increased expense.  With respect to rent, Blue

14

Ridge ENT's physicians owned the building in which Relator practiced, and therefore any "rent" payments subsidized by Centra were ultimately benefiting the physician owners. Increased costs for utilities and maintenance were also inappropriate, as they represented overhead costs of the practice which should not have been attributed to Relator, and no changes occurred during the course of the year to justify the increased costs attributed mid-year to Relator.

c.    Computer maintenance and medical supply costs attributed to Relator were significantly increased, even though these amounts represent overhead costs for the practice and not costs solely attributable to Relator. Moreover, no changes were made to the existing computer maintenance services or medical supplies the practice received to justify the additional costs.

d.    Significantly increased costs for equipment depreciation attributed to Relator. These costs were overhead to the practice and not solely attributable to Relator. These costs should not have been attributed to Relator in the first place, nor should they have increased mid-recruitment year.

59.    Relator was not provided additional space, equipment or nursing staff to justify the increased expenses, nor were these costs attributable to the recruitment of Relator. As a result of these "additional costs" and despite the success of Relator's practice, Centra continued to advance funds to Blue Ridge ENT, ultimately paying Blue Ridge ENT $107,777.86. This total amount was paid by five checks over the course of the year:

a.    $20,833.33 by check dated 9/11/08;

b.    $60,833.33 by check dated 9/26/08;

c.    $6,124.00 by check dated 5/15/09;

15

206691.6

      d.     $16,146 by check dated 6/25/09; and

      e.     $3,841 by check dated 8/17/09.

60.    These payments did not correspond to payments required under the Income Guarantee in the Recruitment Agreement, and these modifications to the Recruitment Agreement were not authorized by Relator as required by the Recruitment Agreement's terms.

61.    Centra's checks were made payable to Relator but mailed to Blue Ridge ENT.  Relator did not endorse any of the checks, despite the checks being made out to Relator.  Blue Ridge ENT deposited the checks without Relator's knowledge, violating the Recruitment Agreement.

62.    In sum, the amounts Centra paid to Blue Ridge ENT, an existing physician practice and referral source for the hospital, exceeded Relator's actual additional incremental costs in violation of the Income Guarantee in the Recruitment Agreement as well as the Stark and AKS laws.

### (vi)    Relator's Discovery of the Improper Attribution of Costs

63.    During the course of his first year with Blue Ridge ENT, Relator was not provided copies of, or access to, the financial statements exchanged between Centra and Blue Ridge ENT pursuant to the Income Guarantee contained in the Recruitment Agreement.  Relator was not informed of the amounts Centra paid to Blue Ridge ENT under the Income Guarantee contained in the Recruitment Agreement.

64.    Relator did not have access to the practice's bank accounts.

65.    When Relator became a part owner in Blue Ridge ENT in June of 2010, Relator repeatedly requested access to the monthly expense statements under the Recruitment

Agreement or financial information relating to the recruitment period but Blue Ridge ENT refused to provide the information.

66.   Relator resigned from Blue Ridge ENT effective June 30, 2011.

67.   Upon Relator's resignation, Centra informed Relator that $80,463.49 had not been forgiven under the Income Guarantee contained in the Recruitment Agreement, and that Centra expected Relator—and Relator alone—to repay this amount to Centra.

68.   Relator asked Centra for a full accounting of amounts received by Blue Ridge ENT and all support for such amounts under the Recruitment Agreement.  Neither Centra nor Blue Ridge ENT provided Relator with the accounting requested or the supporting information.

69.   Relator refused to pay $80,463.49 to Centra and on or around October 29, 2014, Centra brought suit against Relator to obtain the amounts Centra advanced to Blue Ridge ENT under the Income Guarantee contained in the Recruitment Agreement (hereinafter referred to as the "State Claim").  The State Claim sought damages of $48,522 (the $80,463.49 was satisfied in part by Dr. Bolinger's trailing accounts receivable).

70.   In discovery, Relator requested, inter alia, documentation to support the amounts sought by Centra.  Relator received Centra's first round of production on January 20, 2015. Only then did Relator discover the extent of the inappropriate expenses attributed to Relator in violation of Stark and AKS laws, and this Complaint ensued.

71.   Centra admitted that the checks from Centra to Dr. Bolinger were not endorsed by Dr. Bolinger, that Centra advanced funds under the Income Guarantee Agreement based on financials that included "rent," and that Bolinger did not personally provide Centra any financial records of Blue Ridge ENT.

17

**B.**     **DEFENDANTS' CONDUCT VIOLATES THE STARK LAW AND AKS**

72.     Centra knowingly violated the Stark Law and AKS when it paid Blue Ridge ENT, a referral source, for expenses that were not solely attributable to Relator, and then submitted claims to and received reimbursement from Medicaid and Medicare for referrals tainted with those Stark Law and AKS violations.

73.     At least one purpose for Centra's improper payments was to induce referrals of Medicare and Medicaid patients from Blue Ridge ENT and its physicians.

74.     Blue Ridge ENT knowingly and willfully accepted payments from Centra, with whom Blue Ridge ENT had a financial relationship, for practice overhead and other costs not solely attributable to Relator.  Further, Blue Ridge ENT deposited checks from Centra that were made payable to Relator, without Relator's knowledge or endorsement, and, therefore, Centra's recruitment payments were not paid directly to Relator as required by Stark.

75.     Blue Ridge ENT knowingly and willfully requested and accepted the remuneration from Centra in exchange for patient referrals to, inter alia, Centra and its surgical center.

76.     During the period of the improper recruitment relationship that continues today, Centra accepted, and continues to accept, referrals of patients covered by Medicare and Medicaid from Blue Ridge ENT and its physicians in violation of the Stark Law and submitted Medicare and Medicaid claims for such patients in violation of law. Attached hereto as Exhibit "E" and made a part hereof is a Financial Analysis showing procedures performed by Relator in Centra-owned hospitals and a Centra-owned joint-venture ambulatory surgery center for the time period during which Relator was under the Recruitment Agreement with Centra and Blue Ridge ENT (July 1, 2008 – June 30, 2009).

18

For each of these procedures, Centra would have also billed for, and claimed and received reimbursement for designated health services.

77. During the period of Relator's recruitment (July 1, 2008-June 30, 2009), Relator performed hundreds or procedures and referred hundreds of patients to Centra-owned facilities, including Lynchburg General Hospital, Virginia Baptist Hospital and the Lynchburg Surgery Center. Relator's total charges for just the professional component of his services reached $376,784.87. Each of these procedures would have a corresponding facility fee for which Centra would have billed and received payment. Many of these procedures also would have also involved, inter alia, referrals for labwork and diagnostic imaging among other designated health services.

78. Centra submitted cost reports to the Government or its contractors, and such cost reports contained costs from referrals of patients in violation of the AKS and Stark Laws. Centra, by and through its officers, knowingly certified compliance with the AKS and Stark Laws in its cost reports and received reimbursement from the Government on that basis. Centra's certifications were false.

79. Centra also submitted enrollment applications and claims forms to the Government or its contractors for reimbursement of services provided pursuant to illegal referrals from Blue Ridge ENT. Centra would not have been reimbursed by Medicare or Medicaid for these services if the Government had been informed of the Stark Law and AKS violations.

## COUNT I: VIOLATION OF THE FEDERAL FALSE CLAIMS ACT (31 U.S.C. §§ 3729(a)(1)(A) and (B)

80. Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 - 79 of this Complaint.

81.   This is a claim for treble damages and penalties under the federal False Claims Act, 31
      U.S.C. §§ 3729-3733, as amended.

82.   Centra, by and through its officers, agents, and employees, including John Litaker,
      knowingly, or acting with deliberate ignorance or reckless disregard of the truth or falsity
      of the information at issue, presented or caused to be presented, false or fraudulent claims
      for payment or approval to the federal government or certain third-party recipients of
      federal money in violation of 31 U.S.C. § 3729(a)(1)(A).

83.   Defendant Centra, by and through its officers, agents, and employees, knowingly, or
      acting with deliberate ignorance or reckless disregard of the truth or falsity of the
      information at issue, made, used or caused to be made or used records or statements
      material to a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(B).

84.   Centra failed to disclose in its Medicare and Medicaid reimbursement claims that illegal
      referrals had occurred or that kickbacks had been paid.  The Government is prohibited
      from paying claims arising from medical services rendered to improperly referred
      patients.  Such claims were therefore false and material to false claims.

85.   Centra's cost reports covering periods from 2008 to 2009 included costs for services to
      patients who were referred by physicians under financial arrangements prohibited by the
      Stark Law and the AKS.  Centra knowingly, or acting with deliberate ignorance or
      reckless disregard of the truth of the information, certified in each cost report that the
      services identified in its cost reports were provided in compliance with federal laws,
      including the Stark Law and AKS.  This statement was false, and thus each cost report is
      a false record or statement.

86.     The Government relied on Centra's false certification when it accepted and reimbursed Centra based on the costs included in the cost reports.

87.     Defendant Blue Ridge ENT, by and through its officers, agents and employees, including Mary Sue Ramey, knowingly, or acting with deliberate ignorance or reckless disregard of the truth or falsity of the information at issue, presented or caused to be presented, false or fraudulent claims for payment or approval to the federal government or certain third-party recipients of federal money in violation of 31 U.S.C. § 3729(a)(1)(A).   The Government would not have paid Blue Ridge ENT for claims which violated the Stark Law and AKS, had it been aware of the fraudulent nature of the claims.

88.     Defendant Blue Ridge ENT, by and through its officers, agents, and employees, knowingly, or acting with deliberate ignorance or reckless disregard of the truth or falsity of the information at issue, made, used or caused to be made or used records or statements material to a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(B).

89.     Defendant Centra, by and through its officers, agents, and employees, authorized, encouraged, and ratified the actions of its various officers, agents and employees to take the actions set forth above.

90.     As a result of Defendants' acts, Government Health Care Programs including Medicare and Medicaid paid claims for medical treatments that were not covered by those programs or, but for Defendants' submission of the false claims, would not have been paid.

206691.6

91.     Each claim for a service that resulted from a referral from Blue Ridge ENT to Centra or vice-versa is barred by the False Claims Act, even if the services were performed, and even if such services were medically necessary.

92.     By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

## COUNT II:  CONSPIRACY TO VIOLATE THE FALSE CLAIMS ACT
## 31 U.S.C. § 3729(C)

93.     Relator alleges and incorporates by reference the allegations contained in paragraphs 1 - 92 of this Complaint.

94.     Centra, by and through its officers, agents, and employees, conspired with Blue Ridge ENT, by and through its officers, agents and employees to violate 31 U.S.C. § 3729(a)(1)(A) and/or (B) in violation of 31 U.S.C. § 3729(a)(1)(C).

95.     Centra and Blue Ridge ENT conspired to violate the False Claims Act when they agreed to shift practice expenses to Relator that were not solely attributable to Relator.  Centra and Blue Ridge ENT had actual knowledge of the Stark Law and its prohibition on payments over actual incremental recruitment expenses.

96.     In furtherance of such conspiracy, John Litaker, Budget Director for Centra, and Mary Sue Ramey, under the direction of Blue Ridge ENT and its officers, attributed inappropriate practice expenses to Relator that were not incremental expenses solely attributable to Relator.  As a result, Blue Ridge ENT and its physicians received money from Centra to which it was not entitled, made referrals to Centra which were prohibited by the Stark Law and AKS, and retained such overpayments in violation of the False Claims Act.

206691.6

97.     Also in furtherance of such conspiracy, Centra paid a total of $107,777.86 to Blue Ridge ENT.

98.     As a result of the conspiracy, Defendants knowingly submitted false claims and presented false statements to the government or its agents/contractors in order to get false claims paid in violation of the False Claims Act.   Centra submitted false claims when it submitted billing forms seeking Medicare and Medicaid payment for services provided to illegally referred patients, and when it falsely certified compliance with the AKS and Stark Law in its cost reports in 2008 and 2009.   Blue Ridge ENT submitted false claims and received overpayments when it submitted claims for services that constitute prohibited referrals to Centra.   These violations have been ongoing since 2008 and continue today.

## COUNT III: VIOLATION OF THE VFATA
## VA. CODE ANN. § 8.01-216.3

99.     Relator alleges and incorporates by reference the allegations contained in paragraphs 1 - 98 of this Complaint.

100.    Centra knowingly presented false claims for payment to Medicaid in violation of VA Code Ann § 8.01-216.3(1) when it submitted claims for patients referred by Blue Ridge ENT physicians when such referrals were prohibited by the Stark and AKS law.

101.    Centra knowingly made false records and statements in order to get false claims paid by Medicaid in violation of Va. Code Ann.  § 8.01-216.3(2).   Centra's statement in its enrollment applications that, "[t]he provider agrees to comply with all applicable state and federal laws, as well as administrative policies and procedures of VMAP as from time to time amended," has been violated.

102.    Defendants conspired to violate the provisions of VFATA when Centra agreed with Blue Ridge ENT to pay for additional costs not solely attributable to Relator's recruitment in violation of the Stark Law and AKS. Both parties then continued to refer patients and bill the Government for such illegal referrals in violation of the VFATA. These violations continue today.

103.    Defendants are therefore liable to the Commonwealth for a civil penalty of not less than $5,500 and not more than $11,000, plus three times the amount of damages sustained by the Commonwealth. Va. Code Ann. § 8.01-216.3.

### COUNT IV: ILLEGAL RETENTION OF AN OVERPAYMENT
### 31 U.S.C. §§ 3729(a)(1)(G)

104.    Relator alleges and incorporates by reference the allegations contained in paragraphs 1 – 103 of this Complaint.

105.    The False Claims Act also establishes civil penalties and treble damages liability to the United States for an individual or entity that: knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government. 31 U.S.C. § 3729(a)(1)(G).

106.    An "obligation" under the statute, includes the "retention of an overpayment." 31 U.S.C. § 3729(b)(3).

107.    Section 6402 of the Patient Protection and Affordable Care Act of 2010 amended the Social Security Act by adding a new provision that addresses overpayment under the FCA in the context of a federal health care program. An overpayment is defined as "any funds that a person receives or retains under Title XVIII or XIX (Medicare and Medicaid)

to which the person, after applicable reconciliation, is not entitled." 42 U.S.C. § 1320A-7k(d)(4)(B). In addition, this provision specifies in relevant part that an overpayment must be reported and returned by the latter of (1) 60 days after the date on which the overpayment was identified; or (2) the date the corresponding cost report is due. 42 U.S.C. § 1320A-7k(d).

108. Failure to return any overpayment, such as each of the claims on which Centra received an overpayment from Medicare and Medicaid, constitutes a false claim actionable under section 3729(a)(1)(G) of the False Claims Act, and the government is therefore entitled to recover three times the amount of each claim and, for each claim or overpayment, a civil penalty of not less than $5,500 and not more than $11,000.

109. Relator informed Centra's counsel regarding the Stark Law violations present in the recruitment arrangement on May 23, 2014. On knowledge and belief, Centra has not repaid the overpayments to the federal government or its contractors, and the deadline established by 42 U.S.C. § 1320A-7k(d) has passed.

110. Centra has therefore knowingly concealed, avoided, or decreased an obligation to pay or transmit money to the United States in violation of the False Claims Act.

111. Such concealment, avoidance or decrease of an obligation to pay or transmit money to the United States was made or done knowingly, as defined in the False Claims Act.

**PRAYERS FOR RELIEF**

WHEREFORE, Relator, on behalf of the United States and the Commonwealth of Virginia, demands and prays that judgment be entered in his favor against Defendants with the following grant of relief:

(a)     Treble the United States damages, to be determined at trial, plus an $11,000 penalty for each false claim or false statement, as provided by law;

(b)     Treble the United States damages, to be determined at trial, plus an $11,000 penalty for each overpayment retained in violation of the False Claims Act;

(c)     That Plaintiff recover its cost of litigation, including its reasonable attorneys' fees; and

(d)     For all such other and further relief as the Court may deem appropriate.

206691.6

(a)     Treble the United States damages, to be determined at trial, plus an $11,000 penalty for each false claim or false statement, as provided by law;

(b)     Treble the United States damages, to be determined at trial, plus an $11,000 penalty for each overpayment retained in violation of the False Claims Act;

(c)     That Plaintiff recover its cost of litigation, including its reasonable attorneys' fees; and

(d)     For all such other and further relief as the Court may deem appropriate.

## JURY DEMAND

Plaintiff demands trial by jury on all issues

Respectfully submitted this _23rd_ day of May, 2016.

PHILIP M. SPRINKLE II
Virginia Bar No. 20763
**BALCH & BINGHAM LLP**
30 Ivan Allen Jr. Blvd., N.W., Suite 700
Atlanta, Georgia 30308-3036
Telephone: (404) 261-6020
Facsimile: (404) 261-3656